## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ERIC MEYERS,<br>　　　*Plaintiff,*<br><br>　　v.<br><br>PNC FINANCIAL SERVICES GROUP,<br>INC.,<br>　　　*Defendant.* | No. 3:19-cv-01892 (VAB) |

## RULING AND ORDER ON MOTION TO DISMISS

Eric Meyers ("Plaintiff") has sued PNC Financial Services Group, Inc. ("PNC" or "Defendant") for violations arising under the Fair Credit Reporting Act, 15 U.S.C. §§ 1681n and 1681o, as well as for fraudulent and negligent misrepresentation and breach of the covenant of good faith and fair dealing. Am. Compl., ECF No. 28 (June 11, 2020).

PNC has moved to dismiss the Amended Complaint for failure to state a claim. Mot. to Dismiss, ECF No. 41 (Aug. 13, 2020) ("Def.'s Mot."); Mem. of L. in Supp. of Def. PNC Fin. Servs. Grp., Inc.'s Mot. to Dismiss, ECF No. 41-1 (Aug. 13, 2020) ("Def.'s Mem.").

For the following reasons, PNC's motion to dismiss is **GRANTED** in part and **DENIED** in part.

## I.　　FACTUAL AND PROCEDURAL BACKGROUND

### A.　　Factual Allegations[1]

In February 2003, Mr. Meyers allegedly "entered into a loan agreement with National City Bank . . . to finance the purchase of the sea vessel identified as 'Loose Change.'" Am. Compl. ¶ 5.

---

[1] All factual allegations are drawn from the Amended Complaint.

The financing agreement allegedly "consisted of a note and preferred ship mortgage" from Mr. Meyers to National City Bank "securing the principal amount of . . . $70,591," which was "used in the purchase of the vessel." *Id.* ¶ 6.

In October 2008, PNC allegedly acquired National City Bank, which allegedly became a subsidiary of PNC. *Id.* ¶ 7. PNC allegedly "owned the note and mortgage and was a successor by merger to National City Bank," *id.*, and "administered the terms and conditions of the agreement along with all payments," *id.* ¶ 8.

In January or February of 2018, Mr. Meyers allegedly "commenced with strategic financial planning in relation to the purchase of residential real property" in Connecticut, to where he was "moving his primary residence." *Id.* ¶ 9.

On January 19, 2018, Mr. Meyers allegedly "received his initial loan commitment for the purchase of the residential property with Inland Home Mortgage [("IHM")]." *Id.* ¶ 10. IHM allegedly "regularly aggregates credit information on individual consumers, prepares credit evaluations, and reports those evaluations to persons or firms who rely thereon in making decisions about extending consumer credit." *Id.* ¶ 29.

Allegedly under "instruction from IHM," Mr. Meyers "sought to resolve certain outstanding loan obligations to obtain a more favorable debt to income ratio for purposes of meeting the conditions of the loan commitment he had received for the purchase of his home." *Id.* ¶ 10. IHM allegedly "identified the loan agreement with PNC as one that needed to be paid off prior to securing financing for the residential property." *Id.* ¶ 11.

Mr. Meyers's spouse allegedly "contacted PNC for a final pay-off figure in order to satisfy the full balance remaining on the vessel loan." *Id.* ¶ 12. "A representative of PNC" allegedly notified her that the remaining balance, "with respect to all fees and charges," was

$1,536.94. *Id.* ¶ 13. Mr. Meyers then allegedly "made full payment via electronic wire and understood the account to have been closed." *Id.* ¶ 14.

"A closing was scheduled to consummate the purchase of the residential property," to take place on or about March 29, 2018. *Id.* ¶ 15. The portion of the sales price to be financed by Mr. Meyers was allegedly $595,000.00, and he allegedly "entered into a mortgage loan agreement with IHM." *Id.* IHM allegedly characterized the financing as "non-traditional" because Mr. Meyers allegedly "had different sources of income outside of wage earnings which would be shown on an IRS Form W-2." *Id.* This allegedly resulted in "a higher interest rate," and "[t]he mortgage loan was a thirty (30) year commitment with an interest rate of 6.65%." *Id.* At closing, Mr. Meyers allegedly had a 673 FICO credit score, and "prior to the closing," IHM allegedly "ran a credit report . . . and found that no claims of delinquency were present." *Id.* ¶ 16.

On or about March 29, 2018, the closing allegedly occurred "without incident." *Id.* ¶ 17. Prior to closing, IHM allegedly "confirmed that there was no default with regard to the loan agreement with PNC." *Id.*

Mr. Meyers and IHM had allegedly "long[]discussed . . that [Mr. Meyers] would refinance the existing loan on his residential property immediately after closing," *id.* ¶ 18, allegedly because "the criteria utilized by IHM for the determination of financing had improved significantly in favor of [Mr. Meyers] as compared to the time of his initial mortgage commitment from IHM on January 19, 2018." *Id.* "As early as April 2018, [he] was eligible for traditional financing through IHM which would result in a significantly lower interest rate." *Id.*

Following the closing, between March 29, 2018, and May 7, 2018, Mr. Meyers allegedly did not receive "any communication from PNC relating to delinquent payments," *id.* ¶ 19, and

allegedly "understood his account with PNC to have been closed after full payment in February of 2018," *id.* ¶ 20.

In May 2018, Mr. Meyers "desired to refinance his loan with IHM." *Id.* ¶ 21. On May 7, 2018, "[p]rior to formally submitting an application," Mr. Meyers allegedly "discovered a critical misrepresentation on his credit report from Experian, namely, PNC [] had misrepresented the status of [his] account and flagged the loan as sixty (60) days past due." *Id.* ¶ 22. PNC allegedly "reported [Mr. Meyers's] account balance as in default for one dollar ($1.00) of the principal balance of the loan and did so for ninety (90) and one-hundred twenty (120) days thereafter." *Id.*

Mr. Meyers allegedly "immediately contacted PNC and had a telephone conversation with Mark Walters of PNC regarding the misrepresentation found on his credit report." *Id.* ¶ 23. Mr. Meyers allegedly "formally registered a dispute with PNC and he obtained a reference number." *Id.* Mr. Walters allegedly "confirmed that the information provided to the consumer reporting agency . . . was now regarded by PNC as 'in dispute.'" *Id.*

On or about May 9, 2018, Mr. Meyers allegedly "contacted PNC by telephone and requested intervention from a supervisor or manager in relating to his dispute of the false assertion on his credit report." *Id.* ¶ 25. He allegedly "clearly identified to PNC the specific information being disputed, the basis for the dispute, and the evidence supporting his position that PNC had misrepresented the status of his account to Experian." *Id.*

PNC allegedly "failed to provide any relief in terms of remedying the issue with Experian and/or other consumer reporting agencies." *Id.* ¶ 27.

Later, IHM allegedly "contacted PNC on behalf of [Mr. Meyers] to notify PNC of [the] dispute," and allegedly "made it clear to PNC that the false delinquency report was impacting [his] bid to refinance the residential loan." *Id.* ¶ 28.

After IHM's alleged communication with PNC, PNC allegedly "failed to[] conduct an investigation with regard to the dispute, review relevant information, issue an investigative report, promptly notify all other consumer reporting agencies to whom the false information was provided of results of investigation and to issue corrections and/or deletions for meritorious disputes." *Id.* ¶ 31.

On or about June 29, 2018, PNC allegedly "unequivocally confirmed that the loan agreement/account had in fact been paid in full as stated by [Mr. Meyers] and that there was not a one-dollar ($1.00) principal balance remaining for any of the reported periods." *Id.* ¶ 32.

On July 10, 2018, PNC allegedly "released and discharged its lien on the vessel and executed a release of mortgage in favor of [Mr. Meyers]." *Id.* ¶ 33. PNC, however, allegedly "refused to remedy its false communication to the consumer reporting agencies." *Id.* ¶ 34.

On December 11, 2019, Mr. Meyers allegedly "filed written disputes with additional consumer reporting agencies to whom the false delinquency information was [allegedly] provided," including Equifax, Transunion and Experian. *Id.* ¶ 36. These agencies allegedly "received the disputes and reviewed materials submitted therewith," but "no substantive changes were made to the past due characterizations from 2018." *Id.* Mr. Meyers alleges that, "upon information and belief," Equifax, Transunion and Experian "notified PNC of the credit dispute." *Id.*

On January 2, 2020, Mr. Meyers allegedly "again filed disputes with regard to PNC's false reporting to Equifax, Trans[u]nion and Experian," but these agencies again made "no

substantive changes . . . to the past due characterizations from 2018." *Id.* ¶ 38. Equifax, Transunion and Experian allegedly again "notified PNC of the credit dispute."

On or about February 1, 2020, "a deletion was [allegedly] made to information held by certain consumer reporting agencies of the false delinquency that had been maintained and reaffirmed by PNC from March 2018." *Id.* ¶ 41.

Since May 7, 2018, Mr. Meyers allegedly "made substantial efforts to refinance his home mortgage with IHM," *id.* ¶ 42, and "[r]epresentatives of IHM notified [him] that his income, ratios and financial criteria . . . meet the requirements for a lower fixed interest rate associated with a more traditional mortgage loan," *id.* ¶ 43. IHM allegedly informed Mr. Meyers "that his credit score for the period March 2018 through February 2020 was the only impediment to a new loan agreement which . . . would have resulted in a significantly lower interest rate." *Id.* ¶ 45. Mr. Meyers alleges that it is "[o]nly now, after deletion of the false delinquency," that his credit has "recovered to a position" to enable him to refinance his mortgage to acquire a lower fixed interest rate. *Id.* ¶ 44.

Mr. Meyers alleges that "from March 2018 to February 2020, the false delinquency and corresponding decrease in credit score caused material and harmful disruption of [his] business." *Id.* ¶ 46.

### B.    Procedural History

On November 27, 2019, Mr. Meyers filed a Complaint against PNC. Compl., ECF No. 1 (Nov. 27, 2019).

On February 25, 2020, Mr. Meyers filed an Amended Complaint. Am. Compl., ECF No. 8 (Feb. 27, 2020).

On March 20, 2020, PNC filed an Answer and set forth affirmative defenses. Answer, ECF No. 10 (Mar. 20, 2020).

On June 11, 2020, Mr. Meyers moved for leave to file another amended complaint. Mot. for Leave to File Am. Compl., ECF No. 27 (June 11, 2020). On July 6, 2020, the Court granted Mr. Meyers' motion for leave to amend. Order, ECF No. 31 (July 6, 2020).

On August 13, 2020, PNC moved to dismiss Mr. Meyers's Amended Complaint for failure to state a claim. Def.'s Mot.

On September 17, 2020, Mr. Meyers objected to the motion to dismiss. Obj. to Def.'s Mot. to Dismiss, ECF No. 45 (Sept. 17, 2020) ("Pl.'s Obj.").

On October 9, 2020, PNC replied to Mr. Meyers' objection. Def.'s Mem. in Reply to Pl.'s Obj. to Def.'s Mot. to Dismiss Am. Compl., ECF No. 51 (Oct. 9, 2020) ("Def.'s Reply").

On December 17, 2020, the Court held a hearing by videoconference on the motion to dismiss. Min. Entry, ECF No. 55 (Dec. 17, 2020).

## II.     STANDARD OF REVIEW

### A.  Rule 12(b)(6)

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "two working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), a court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. A court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.")).

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

**III.    DISCUSSION**

Mr. Meyers's Amended Complaint sets forth five counts: (1) a violation of 15 U.S.C. § 1681n; (2) a violation of 15 U.S.C. § 1681o; (3) fraudulent misrepresentation; (4) negligent misrepresentation; and (5) breach of the covenant of good faith and fair dealing.

The Court addresses each claim in turn.

**A.  The FCRA Claims (Section 1681n and 1681o)**

The FCRA imposes various requirements on consumer reporting agencies to ensure that they adopt "reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." *Trikas v. Universal Card Servs. Corp.*, 351 F. Supp. 2d 37, 41 (E.D.N.Y. 2005) (quoting 15 U.S.C. § 1681(b)). The FCRA establishes civil liability for both willful and negligent noncompliance with the statute. *See* 15 U.S.C. § 1681n (governing "[c]ivil liability for willful noncompliance"); § 1681o (governing "[c]ivil liability for negligent noncompliance").

Section 1681n provides:

> **(a) In general**
>
> Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of—
>
> (1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000; or
>
> (B) in the case of liability of a natural person for obtaining a consumer report under false pretenses or knowingly without a

permissible purpose, actual damages sustained by the consumer as a result of the failure or $1,000, whichever is greater;

(2) such amount of punitive damages as the court may allow; and

(3) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

15 U.S.C. § 1681n.

Section 1681o provides liability in the form of actual damages for "[a]ny person who is negligent in failing to comply with any requirement imposed under this subchapter." *Id.* § 1681o.

Mr. Meyers alleges that liability under both Section 1681n and 1681o arises under Section 1681s-2(b) of the FCRA. *See* Am. Compl. at 11 ¶ 47 ("As a furnisher of consumer information, PNC has violated one or more of its duties under 15 U.S.C. § 1681s-2(b) giving rise to a private cause of action under 15 U.S.C. § 1681n."); *id.* at 13 ¶ 47 ("As a furnisher of consumer information, PNC has violated one or more of its duties under 15 U.S.C. § 1681s-2(b) giving rise to a private cause of action under 15 U.S.C. § 1681o.").

Under 15 U.S.C. § 1681s-2(b), "[a]fter receiving notice [under] section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency,[2] the person shall":

[2] The FCRA defines "consumer reporting agency" as

any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681a(f).

(A) conduct an investigation with respect to the disputed information;

(B) review all relevant information provided by the consumer reporting agency [under] section 1681i(a)(2) of this title;

(C) report the results of the investigation to the consumer reporting agency;

(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and

(E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly—

(i) modify that item of information;

(ii) delete that item of information; or

(iii) permanently block the reporting of that item of information.

15 U.S.C. § 1681s-2(b).

Section 1681i(a)(2), governing "[p]rompt notice of dispute[s] to furnisher of information," provides:

(A) In general

Before the expiration of the 5-business-day period beginning on the date on which a consumer reporting agency receives notice of a dispute from any consumer or a reseller in accordance with paragraph (1), the agency shall provide notification of the dispute to any person who provided any item of information in dispute, at the address and the manner established with the person. The notice shall include all relevant information

regarding the dispute that the agency has received from the consumer or reseller.

(B) Provision of other information

The consumer reporting agency shall promptly provide to the person who provided the information in dispute all relevant information regarding the dispute that is received by the agency from the consumer or the reseller after the period referred to in subparagraph (A) and before the end of the period referred to in paragraph (1)(A).

*Id.* § 1681i(a)(2).

Mr. Meyers alleges that PNC's violations "were willful and/or intentional in that it had confirmed that it had misrepresented a delinquency . . . and took steps to release any claims related to the loan agreement, yet failed to correct the false report with the consumer reporting agencies." Am. Compl. at 11-12 ¶ 48. He alleges, apparently in the alternative, *see* Pl.'s Obj. at 13, that "PNC's acts and/or omissions with regard to correcting the issue with the consumer reporting agencies was careless and/or in reckless disregard of its obligations relating to providing accurate consumer information." Am. Compl. at 13 ¶ 50.

PNC argues that Mr. Meyers has failed to state a claim for relief under 15 U.S.C. §§ 1681n and 1681o on several grounds.

First, PNC argues that Mr. Meyers has failed to plead "that PNC was notified of the disputed delinquency by a [CRA] [and] when any such notification occurred." Def.'s Mem. at 3. In PNC's view, Mr. Meyers has failed to adequately plead "when a CRA notified PNC of the credit dispute and, thus, when any obligations under [Section 1681s-2(b)] were thereby triggered," because the Amended Complaint only "perfunctorily asserts that 'upon information and belief, Equifax, Trans[u]nion and Experian notified PNC of the credit dispute.'" *Id.* at 5 (citing Am. Compl. ¶ 36) (alteration omitted).

Second, PNC argues that Mr. Meyers has failed to plead "that [he] was harmed as a result of any failure by PNC to timely or properly respond to any such notification by a CRA as required [under] these sections of the FCRA," *id.* at 3, because "[t]he only damages alleged . . . under the [FCRA claims] result from PNC's alleged failure to correct delinquency information in [Mr. Meyers's] credit report after [Mr. Meyers], rather than a CRA, directly notified PNC of his dispute." *Id.* at 6. As PNC argues, Mr. Meyers "does not allege any damages after the triggering notice by a CRA." *Id.* at 6-7.

Mr. Meyers responds that PNC was notified of the dispute not only by him, but also by "four[] separate consumer reporting agencies," including IHM, Experian, Equifax, and Transunion. Pl.'s Obj. at 2. Mr. Meyers argues that he has alleged that "IHM constitutes a consumer reporting agency under the FCRA and that it notified PNC of [his] dispute and specifically detailed the manner in which [he] was harmed." *Id.* at 6. Mr. Meyers also responds that "Experian, Transunion and Equifax . . . likewise notified PNC of his dispute." *Id.* at 7.

With respect to harm, Mr. Meyers argues that he has sufficiently pled that "he suffered significant economic harm related to the FCRA violations, including, but not limited to cratering of his credit score, loss of business opportunity, higher interest rates on his home loan[,] and the freezing of usable financial assets." *Id.* at 3.

PNC replies that "[t]he Amended Complaint provides no additional facts about IHM, or its business, from which one could reasonably conclude, reading the Amended Complaint in a light most favorable to Plaintiff, that IHM does in fact regularly act as a 'consumer reporting agency' as defined by the FCRA." Def.'s Reply at 2. In PNC's view, "[u]nless IHM regularly assembles consumer credit information 'for the purpose of furnishing consumer reports to third parties,' and acts with the specific intent to provide a consumer report, it is not a consumer

13

reporting agency" under the statute, and "cannot, by way of notice to a furnisher of consumer credit information such as PNC, trigger obligations . . . under § 1681s-2(b)." *Id.* at 3.

PNC also replies that even if IHM were a CRA, Mr. Meyers's claims fail because he has failed to plead that IHM effectively provided notice of a dispute to PNC under § 1681i(a)(2). *Id.* at 4-5. PNC similarly argues that Mr. Meyers has failed to plead when Equifax, Transunion or Experian notified PNC of a dispute under Section 1681i(a)(2), as well as to allege "the date by which PNC was required, but failed, to act as obligated under § 1681s-2(b)." *Id.* at 5.

The Court disagrees.

Courts in this District have held that "[a]lthough there is a private right of action under [§ 1681s-2(b)], the duty to investigate is only triggered after a furnisher is notified of a dispute by a CRA." *Sprague v. Salisbury Bank and Tr. Co.*, No. 3:18-cv-001487 (VLB), 2019 WL 4146601, at *5 (D. Conn. Sept. 5. 2019) (collecting cases), *aff'd*, 969 F.3d 95 (2d Cir. 2020). Accordingly, "[t]o state a claim under [S]ection 1681s-2(b) of the statute, a plaintiff must allege that a furnisher received notice of a credit dispute from a consumer reporting agency." *Munroe v. Nationstar Mortg. LLC*, 207 F. Supp. 3d 232, 238 (E.D.N.Y. 2016). And "to trigger the furnisher's duties to investigate and correct disputed information, the improper performance of which may give rise to a private party claim under [§ 1681s-2(b)], that private claimant must have reported the dispute to the CRA." *Sprague*, 2019 WL 4246601, at *6 (citing *Pleznac v. Equity Residential Mgmt., LLC*, 320 F. Supp. 3d 99, 106 (D.D.C. 2018) ("To prevail on a claim against a furnisher under § 1681s-2(b), a plaintiff must show both that (1) she notified the reporting agency (here, Transunion) of the disputed credit information and that (2) the agency in turn provided notice to the furnisher (here, Equity).")). Notice to the furnisher must be provided in accordance with the terms set forth in § 1681i(a)(2). *Id.* at *6 (citing *Elmore v. N. Fork*

*Bancorporation, Inc.*, 325 F. Supp. 2d 336, 340 (S.D.N.Y. 2004)). In sum, to bring a claim

arising under § 1681s-2(b), a plaintiff must establish "(1) that he or she notified the consumer

reporting agency of the disputed information, (2) that the consumer reporting agency notified the

defendant furnisher of the dispute, and (3) that the furnisher then failed to investigate and modify

the inaccurate information." *Pride Acquisitions, LLC v. Osagie*, No. 3:12-cv-639 (JCH), 2014

WL 4843688, at *8 (D. Conn. Sept. 29, 2014) (quoting *Ausar-El v. Barclay Bank Delaware*, No.

PJM 12-0082, 2012 WL 3137151, at *3 (D. Md. July 31, 2012)).

PNC makes three primary arguments: (1) that Mr. Meyers has not sufficiently alleged

that IHM is a consumer reporting agency as required by the FCRA; (2) that even if Mr. Meyers

has sufficiently pled that IHM is a consumer reporting agency under the FCRA, he has not

sufficiently pled that his interaction with IHM, and IHM's subsequent interaction with PNC,

followed the notice procedures required under Section 1681i(a)(2); and (3) that Mr. Meyers has

not sufficiently alleged when Equifax, Transunion or Experian supposedly notified PNC of a

dispute, but instead relies only on allegations made "upon information and belief." Def.'s Reply

at 16.

PNC's first argument, that Mr. Meyers has not plausibly established that IHM is a

consumer reporting agency under the FCRA, *see* Def.'s Reply at 1-2, is premature at this stage of

the case. Mr. Meyers's Amended Complaint alleges that "IHM is a 'consumer reporting agency'

as that term is defined under the [FCRA], in that, for monetary fees, IHM regularly aggregates

credit information on individual consumers, prepares credit evaluations, and reports those

evaluations to persons or firms who rely thereon in making decisions about extending consumer

credit." Am. Compl. ¶ 29. Mr. Meyers also has alleged that "IHM ran a credit report prior to the

closing" of his property, *id.* ¶ 16, and that "IHM contacted PNC on behalf of [Mr. Meyers] to

15

notify PNC of a dispute with regard to the false delinquency report impacting [his] credit," *id.*

¶ 28, actions which would plausibly be undertaken by consumer reporting agency as defined

under the FCRA, *see* 15 U.S.C. § 1681a(f) (defining "consumer reporting agency," in part, as

"any person which, for monetary fees . . . regularly engages in whole or in part in the practice of

assembling or evaluating consumer credit information or other information on consumers for the

purpose of furnishing consumer reports to third parties . . .").

PNC provides no support for its assertion that Mr. Meyers is required to plead "additional

facts about IHM, or its business" definitively establishing it as a consumer reporting agency

under the FCRA for his claims to survive a motion to dismiss. Def.'s Reply at 3. The sole case

relied upon by PNC for this argument, *Kidd v. Thompson Reuters Corp.*, 925 F. 3d 99 (2d Cir.

2019), does not require such a finding. *See* Def.'s Reply at 2-3. There, the Second Circuit held

that "[t]o qualify as a 'consumer reporting agency' under the [FCRA], an entity must specifically

intend to furnish a consumer report." 925 F.3d at 103. The FCRA defines "consumer report" as

> any written, oral, or other communication of any information by
> a consumer reporting agency bearing on a consumer's credit
> worthiness, credit standing, credit capacity, character, general
> reputation, personal characteristics, or mode of living which is
> used or expected to be used or collected in whole or in part for
> the purpose of serving as a factor in establishing the consumer's
> eligibility for—(A) credit or insurance to be used primarily for
> personal, family or household purposes; (B) employment
> purposes; or (C) any other purpose authorized under [Section
> 1681b].

15 U.S.C. § 1681a(d)(1). "Thus, the principal uses of 'consumer reports' are for determining

eligibility of consumers for extensions of credit, providing insurance, or reviewing employment

applications." *Kidd*, 925 F.3d at 104.

Taking Mr. Meyers's allegations as true, as the Court must at this stage of the case, it is

plausible that IHM operates with the intent to furnish "consumer reports" as defined under the

FCRA. *See* Am. Compl. ¶ 29 ("[F]or monetary fees, IHM regularly aggregates credit information

on individual consumers, prepares credit evaluations, and reports those evaluations to persons or

firms who rely thereon in making decisions about extending consumer credit.").

As to PNC's second argument, that Mr. Meyers fails to plead that his communications

with IHM, and IHM's communications with PNC, satisfy the requirements of Section

1681i(a)(1)(A), this argument too is premature. PNC argues without support that because "there

is no allegation by [Mr. Meyers] in his Amended Complaint that he even submitted a 'notice of

dispute' to IHM," or that IHM "maintained a 'consumer file'" on Mr. Meyers, his claims fail as a

matter of law. Def.'s Reply at 3-4. The Amended Complaint, however, plainly alleges that IHM

was aware of both the dispute and of the alleged impact that the dispute had on Mr. Meyers's

creditworthiness. *See, e.g.*, Am. Compl. ¶ 28 ("IHM contacted PNC on behalf of the Plaintiff to

notify PNC of a dispute with regard to the false delinquency report impacting the Plaintiff's

credit. IHM further made it clear to PNC that the false delinquency report was impacting the

Plaintiff's bid to refinance the residential loan."). The FCRA does not provide, and the Court is

not aware of any Second Circuit case law, providing more clarity as to the form a "notice of

dispute" or "consumer file" must take such that Mr. Meyers's pleading is insufficient on its face.

*See* § 1681i(a)(1)(A).

For similar reasons, PNC's argument that the Amended Complaint does not sufficiently

plead that "IHM sent a 'notification of dispute' to PNC within 5 business days of receiving a

'notice of dispute' from [Mr. Meyers] . . . or that PNC then failed to comply with obligations

under Section 1681s-2(b)(1) within 30 days of" receiving this notice of dispute is also

unavailing. Def.'s Reply at 4-5. The Amended Complaint alleges that IHM both contacted PNC

to discuss the alleged error on Mr. Meyers's credit report, *see* Am. Compl. ¶ 28 ("IHM contacted

17

PNC on behalf of the Plaintiff to notify PNC of a dispute with regard to the false delinquency report impacting the Plaintiff's credit."), and that as of December 11, 2019, PNC had "fail[ed] to meaningfully address the credit dispute," *id.* ¶ 36, and "refused to remedy its false communication to the consumer reporting agencies," *id.* ¶ 34.

PNC cites no authority for the proposition that, at this early stage of the case, to state a claim under §§ 1681n or 1681o, Mr. Meyers is required to plead with particularity either the timeline by which IHM contacted PNC, or by which PNC allegedly failed to remedy the error on Mr. Meyers's credit report. Nor has PNC provided authority for the proposition that even if IHM had failed to comply with the 5-day window set forth under § 1681i(a)(1)(A), this would mean that Mr. Meyers's claims against PNC fail as a matter of law.

In any event, the Court need not definitively resolve at this stage of the case whether Mr. Meyers's alleged communication with IHM, and IHM's alleged subsequent communication with PNC, effectively provided PNC notice as required under § 1681i(a)(2), as Mr. Meyers has sufficiently pled that PNC was notified of the alleged dispute by Equifax, Transunion, and Experian. *See* Am. Compl. ¶¶ 36-38.

PNC argues that Mr. Meyers's allegations that "upon information and belief," Equifax, Transunion, and Experian contacted PNC with respect to the alleged dispute are insufficient because Mr. Meyers "cannot evade standard pleading requirements by premising a required element on nothing more than information and belief." Def.'s Mem. at 5-6 (citing *O'Neill v. Riversource Life Ins. Co.*, No. 3:10-cv-898 JCH, 2010 WL 3925988, at *3 (D. Conn. Sept. 29, 2010)). In *O'Neill*, however, the plaintiff set forth conclusory claims that alleged no specific facts with particularity. *O'Neill*, 2010 WL 3925988, at *3 ("[Plaintiff] alleges that '[u]pon information and belief, the Defendant RiverSource has improperly evaded disability income

claims . . . as a general business practice.'"). But here, Mr. Meyers has specifically identified the date on which he notified these agencies of the dispute, *see* Am. Compl. ¶ 36 ("On December 11, 2019, after PNC's failure to meaningfully address the credit dispute, the Plaintiff filed written disputes with additional consumer reporting agencies to whom the false delinquency information was provided, to wit: Equifax, Trans[u]nion and Experian."); the date on which he followed up with those agencies, *see id.* ¶ 38 ("On January 2, 2020, the Plaintiff again filed disputes with regard to PNC's false reporting to Equifax, Trans[u]nion and Experian."); and has alleged that these agencies reviewed his materials and notified PNC, *see, e.g.*, *id.* ("The consumer reporting agencies received the disputes and reviewed materials submitted therewith . . . . Upon information and belief, Equifax, Transunion and Experian notified PNC of the credit dispute."). The Amended Complaint alleges further that PNC did not rectify the alleged error until February 1, 2020, more than 30 days after Equifax, Transunion and Experian were allegedly notified of the dispute. *Id.* ¶ 41.

As the court made clear in *O'Neill*, "pleading 'upon information and belief' is permitted," so long as the plaintiff has "do[ne] more than recite the elements of the cause of action." 2010 WL 3925988, at *3 (citing *Arista Records LLC v. Doe 3*, 604 F.3d 110, 119-20 (2d Cir. 2010)). Mr. Meyers has done more than merely recite the element that a consumer reporting agency at some point contacted PNC: he has alleged the specific agencies making contact with PNC, a specific timeline as to the alleged contact with PNC, and the substance of this contact.

Finally, PNC's argument that Mr. Meyers has failed to allege cognizable damages due to PNC's alleged violation of § 1681s-2(b) also fails at this stage. *See* Def.'s Mem. at 6-7, Def.'s Reply at 5. The Amended Complaint alleges numerous harms that purportedly resulted from PNC's failure to correct the alleged error with respect to Mr. Meyers's loan, including that "from

March 2018 to February 2020, the false delinquency and corresponding decrease in credit score caused material and harmful disruption of the Plaintiff's business," Am. Compl. ¶ 46; that Mr. Meyers "has been unable to refinance the home mortgage on his residential property due to PNC's failure to cure and has additionally suffered devastating economic harm associated with the precipitous drop in his credit score," *id.* ¶ 51; and that his "credit score for a period of approximately two (2) years went from 'good' and was reduced to 'fair,' which . . . deprived him of significant potential to reinvest and grow his businesses," *id.* ¶ 52. Mr. Meyers has alleged that he continued to suffer these damages until February 2020, *id.* ¶ 46, a date which follows Mr. Meyers's alleged notifications of the dispute to IHM, Equifax, Transunion and Experian, *see id.* ¶¶ 28, 36, 38.

Accordingly, PNC's motion to dismiss Mr. Meyers's FCRA claims under §§ 1681n and 1681o will be denied.

### B. State Tort Claims (Fraudulent Misrepresentation, Negligent Misrepresentation, and Breach of the Covenant of Good Faith and Fair Dealing)

PNC has moved to dismiss Mr. Meyers's state law claims of fraudulent misrepresentation, negligent misrepresentation, and breach of the covenant of good faith and fair dealing, arguing that "[d]espite their varied titles, all three counts are premised upon the same or similar set of incomprehensible factual allegations," which fail to state a claim under any count.[3] Def.'s Mem. at 7.

---

[3] In its reply brief, PNC also raises the argument that Mr. Meyers's state-law claims are preempted by 15 U.S.C. § 1681t(b)(1)(F). *See* Def.'s Reply at 6-7. The Court declines to consider this argument, as "new arguments may not be made in a reply brief." *Cuba-Diaz v. Town of Windham*, 274 F. Supp. 2d 221, 230 n.8 (D. Conn. 2003) (quoting *Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 1999)); D. Conn. L. Civ. R. 7(d) ("A reply memorandum must be strictly confined to a discussion of matters raised by, and must contain references to the pages of, the memorandum to which it replies.").

### 1.   Fraudulent Misrepresentation

In Connecticut, the essential elements of common-law fraud are: "(1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury . . . . Under a fraud claim of this type, the party to whom the false representation was made claims to have relied on that representation and to have suffered harm as a result of the reliance." *Sturm v. Harb Dev., LLC*, 298 Conn. 124, 142 (2010) (quoting *Suffield Dev. Assocs. Ltd. P'ship v. Nat'l Loan Inv'rs, L.P.*, 260 Conn. 766, 777–78 (2002)). "In contrast to a negligent representation, [a] fraudulent representation . . . is one that is knowingly untrue, or made without belief in its truth, or recklessly made and for the purpose of inducing action upon it." *Kramer v. Petisi,* 285 Conn. 674, 684 n. 9 (2008) (internal quotation marks omitted). "This is so because fraudulent misrepresentation is an intentional tort." *Id.* at 684.

Federal Rule of Civil Procedure 9(b) provides that, in alleging fraud, "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy this rule, a plaintiff must allege "the time, place, speaker, and sometimes even the content of the alleged misrepresentations." *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986); *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir. 1996) (observing that when a complaint includes a claim of fraud, "it must (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent."). While Rule 9(b) allows general allegations regarding state of mind, such general allegations must be accompanied by descriptions of the "events which [plaintiff] assert[s] give rise to a strong inference" of the

defendant's state of mind. *Ross v. A.H. Robins Co., Inc.*, 607 F.2d 545, 558 (2d Cir. 1979); Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("[T]he relaxation of Rule 9(b)'s specificity requirement for scienter must not be mistaken for license to base claims of fraud on speculation and conclusory allegations. Therefore . . . we require plaintiffs to allege facts that give rise to a strong inference of fraudulent intent.") (citations and internal quotation marks omitted)). A strong inference of fraud exists where the plaintiff alleges (a) "facts to show that defendants had both motive and opportunity to commit fraud, or (b) [] facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995) (citation and internal quotation marks omitted); *Gabrielle v. Law Office of Martha Croog*, No. 3:10-cv-1798 (WWE), 2012 WL 460264, at *4 (D. Conn. Feb. 9, 2012) (citation omitted).

Mr. Meyers's claim for fraudulent misrepresentation stems from PNC's alleged representations to him in June and July of 2018 that his account with PNC was "paid in full." *See* Am. Compl. at 14-15 ¶¶ 34-43. Mr. Meyers argues that PNC "knew that its statements to [him] were not representative of its true position with regard to the account as [PNC] continued to identify the Plaintiff, within the organization of PNC, as in default and shared that position with third parties." *Id.* at 15 ¶ 44.

PNC argues that Mr. Meyers has failed to state a claim of fraudulent misrepresentation, calling Mr. Meyers's allegations "incomprehensible" and arguing that Mr. Meyers has "ma[de] no effort to elaborate as to what he means by these statements."[4] Def.'s Mem. at 8-9.

---

[4] PNC again raises a new argument on reply, or that Mr. Meyers has "fail[ed] to allege anywhere in his Amended Complaint that the facts asserted in these letters were false." Def.'s Reply at 8 (emphasis omitted). In its initial memorandum, however, PNC argues that "Plaintiff appears to assert that PNC's representations in June and July 2018 were 'false' because 'its statements to the Plaintiff' did not represent 'PNC's true position . . . .'" Def.'s Mem.

The Court disagrees.

Mr. Meyers's Amended Complaint has plausibly alleged all of the elements of fraudulent misrepresentation under Connecticut law. *See Sturm*, 298 Conn. at 142. He has alleged that a false representation was made as a statement of fact, Am. Compl. at 15 ¶ 43 ("The Defendant's representations in June and July of 2018 [that the loan was paid in full] were false in that the Defendant did not hold the position that Plaintiff's account had been 'paid in full,' completed and/or satisfied. Rather, the Defendant held the position that the Plaintiff's balance was unpaid and that certain late fees were outstanding."); that the claim was untrue and known to be untrue as to the party making it, *id.* ¶ 44 ("The Defendant knew that its statements to the Plaintiff were not representative of its true position with regard to the account as the Defendant continued to identify the Plaintiff, within the organization of PNC, as in default and shared that position with third parties."); that the statement was made to induce the other party to act upon it, *id.* at 16 ¶ 46 ("The Defendant made these misrepresentations to the Plaintiff in order to induce him to discontinue his petition for relief against it and to quell his discontent with PNC's earlier actions to identify the Plaintiff as delinquent and its attempt to continue collection efforts."); and that Mr. Meyers acted upon that false representation to his injury, *id.* ¶ 48 ("The Plaintiff relied upon these misrepresentations to his detriment in that he forewent opportunities for further adjudication of this dispute in order to bring it to a satisfactory conclusion.").

Moreover, Mr. Meyers has alleged the time, place, speaker and content of the alleged misrepresentations, as required by Rule 9(b). *Luce*, 802 F.2d at 54; *see also Khazarian v. Gerald Metals, LLC*, No. 3:16-cv-01762 (VAB), 2017 WL 5240868, at *5 (D. Conn. Nov. 9, 2017)

---

at 8. These inconsistencies notwithstanding, the Court declines to consider PNC's argument that Mr. Meyers has failed to allege that the facts asserted in PNC's letters were false. *See Cuba-Diaz*, 274 F. Supp. 2d at 230 n.8; D. Conn. L. Civ. R. 7(d).

(finding that the plaintiff had sufficiently "identified a speaker by alleging that the representatives from [Defendants]" gave her the disputed information) (citing *Loreley Fin. (Jersey) No. 3 Ltd. V. Wells Fargo Sec., LLC*, 797 F.3d 160, 171-72 (2d Cir. 2015)). Accordingly, Mr. Meyers's fraudulent misrepresentation claim will not be dismissed.

### 2. Negligent Misrepresentation

Under Connecticut law, the elements of negligent misrepresentation are:

> [o]ne who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Foy v. Pratt & Whitney Grp*, 127 F. 3d 229 (2d Cir. 1997) (quoting *Williams Ford, Inc. v. Hartford Courant Co.*, 232 Conn. 559, 575 (1995)).

In an action for negligent misrepresentation, a plaintiff must establish "(1) that the defendant made a misrepresentation of fact[,] (2) that the defendant knew or should have known was false, [ ] (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result." *Nazami v. Patrons Mut. Ins. Co.*, 280 Conn. 619, 626 (2006) (citing *Glazer v. Dress Barn, Inc.*, 274 Conn. 33, 78 (2005)). A misrepresented fact may be actionable "if the declarant has the means of knowing, out to know, or has the duty of knowing the truth." *D'Ulisse-Cupo v. Bd. of Dirs. of Notre Dame High Sch.*, 202 Conn. 206, 217 (1987). Plaintiffs "need not prove that the representations made by the defendants were promissory. It is sufficient to allege that the representations contained false information." *Id.* at 218.

Courts in this District have held that misrepresentation claims are also subject to a heightened pleading standard under Rule 9(b). *See Yurevich v. Sikorsky Aircraft Div., United Techs. Corp.*, 51 F. Supp. 2d 144, 152 (D. Conn. 1999) (citing *Catalano v. Bedford Assocs. Inc.*,

9 F. Supp. 2d 133, 136 (D. Conn. 1998)); *but see IM Partners v. Debit Direct Ltd.*, 394 F. Supp.

2d 503, 521 (D. Conn. 2005) ("[T]he false statements [of] an element of negligent

misrepresentation do not have to be stated with the same degree of particularity [as a claim of

fraud] to survive a motion to dismiss.").

PNC sets forth the same arguments with respect to Mr. Meyers's negligent

misrepresentation claim as to his fraudulent misrepresentation claim. *See* Def.'s Mem. at 8-9;

Def.'s Reply at 8-9.

Accordingly, for the same reasons as described with respect to Mr. Meyers's fraudulent

misrepresentation claim, his negligent misrepresentation claim will not be dismissed.[5]

### 3.  The Breach of the Implied Covenant of Good Faith and Fair Dealing Claim

In Connecticut, the majority of contracts carry "an implied covenant of good faith and

fair dealing," which requires both parties to refrain from doing "anything that will injure the right

of the other to receive the benefits of the agreement." *Hudson United Bank v. Cinnamon Ridge*

*Corp.*, 81 Conn. App. 557, 576, 845 A.2d 417 (Conn. App. 2004); *see also Magnan v. Anaconda*

*Indus., Inc.*, 193 Conn. 558, 566 (1984) (noting that the Restatement (Second) of Contracts

recognizes this covenant in every contract "without limitation"). "The covenant . . . presupposes

that the terms and purpose of the contract are agreed upon by the parties and what is in dispute is

a party's discretionary application or interpretation of a contract term." *De La Concha of*

*Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 433 (2004). To fulfill its duty, a party may

not "do anything that will injure the right of the other to receive the benefits of the agreement."

*Id.* at 432 (internal quotation marks and citation omitted).

---

[5] Mr. Meyers represents in his objection to the motion to dismiss that he has made this claim "in the alternative." Pl.'s Obj. at 13.

Under Connecticut law, a party asserting a breach of the covenant of good faith and fair dealing must prove three elements:

> [F]irst, that the plaintiff and the defendant were parties to a contract under which the plaintiff reasonably expected to receive certain benefits; second, that the defendant engaged in conduct that injured the plaintiff's right to receive some or all of those benefits; and third, that when committing acts by which it injured the plaintiff's right to receive benefits he reasonably expected to receive under the contract, the defendant was acting in bad faith.

*Bagley v. Yale Univ.*, 42 F. Supp. 3d 332, 359-60 (quoting *Franco v. Yale*, 238 F. Supp. 2d 449, 455 (D. Conn. 2002)). Bad faith implies "both 'actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation . . . prompted . . . by some interested or sinister motive.'" *Habertz v. Condon*, 224 Conn. 231, 237 (1992) (citation omitted).

PNC argues that Mr. Meyers's breach of the covenant of good faith and fair dealing claim fails because "it does not allege that PNC violated any particular term of a contract with [him]," and "does not cite to a single term of a contract with PNC." Def.'s Reply at 9; *see also* Def.'s Mem. at 10 ("Plaintiff [has] failed to allege that PNC breached any specific contract term.").

The Court agrees.

"The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term." *Geysen v. Securitas Sec. Servs. USA, Inc.*, 322 Conn. 385, 399 (2016) (quoting *De La Concha of Hartford, Inc.*, 269 Conn. at 432-33; *see also Landry v. Spitz*, 102 Conn. App 34, 47 (2007) ("Stated otherwise, the claim [that the covenant has been breached] must be tied to an alleged breach of a specific contract term, often one that allows for discretion on the party of the party alleged to have violated the duty." (internal

quotation marks omitted)). As a result, "[m]ost courts decline to find a breach of the covenant apart from a breach of an express contract term." *Landry*, 102 Conn. App. at 47; *see also E. Point Sys., Inc. v. Maxim*, No. 3:13-cv-00215 VLB, 2014 WL 523632, at *5 (D. Conn. Feb. 7, 2014) (dismissing breach of implied covenant counterclaim because "Defendants do not cite to any specific provisions of any contract which they allege constituted the basis for the breach of the implied duty of good faith and fair dealing"); *Beckenstein Enters.-Prestige Park, LLC v. Keller*, 115 Conn. App. 680, 693-94 ("[A] claim for breach of the implied covenant of good faith and fair dealing must be based on the terms of the contract and cannot be applied to achieve a result contrary to the express terms.").

While Mr. Meyers has alleged that he and PNC were parties in a contract under which he reasonably expected to receive certain benefits, *see* Am. Compl. at 28 ¶¶ 51-53 (describing the February 2003 loan agreement allegedly entered into between the parties, and noting that Mr. Meyers "anticipated receiving the benefit of full payment of the principal amount and interest upon the maturity date of the loan"), that PNC engaged in conduct that injured his right to receive all or some of those benefits, *see id.* ¶ 55 ("Upon making full payment of the principal balance of the loan, with interest, the Defendant failed to provide the commensurate benefit that demanded relinquishment of any retained markers of non-payment or default."), and that when committing acts by which it injured Mr. Meyers's right to receive benefits he reasonably expected to receive under the contract, PNC was acting in bad faith, *see id.* ¶ 54 ("The Plaintiff further expected, that in every aspect of the contractual relationship, the Defendant would act in good-faith rather than in a deceptive manner."), *see Bagley*, 42 F. Supp. 3d at 359-60, he has failed to identify a "specific contract term" under which the breach allegedly arises. *Landry*, 102 Conn. App. at 47; *Geysen*, 322 Conn. at 399.

Accordingly, Mr. Meyers's breach of the covenant of good faith and fair dealing claim will be dismissed.

**IV.     CONCLUSION**

For the foregoing reasons, PNC's motion to dismiss for failure to state a claim is **GRANTED** in part and **DENIED** in part.

**SO ORDERED** at Bridgeport, Connecticut, this 23rd day of December, 2020.

/s/ Victor A. Bolden

VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE