UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ERIC MEYERS,      ) | 3:19-CV-01892 (SVN) |
| *Plaintiff*,       ) | |
|                    ) | |
| v.                 ) | |
|                    ) | |
| PNC FINANCIAL SERVICES GROUP,  ) | |
| INC.               ) | September 28, 2022 |
| *Defendant*.       ) | |

**RULING AND ORDER ON PLAINTIFF'S MOTION FOR LEAVE TO AMEND THE COMPLAINT AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Sarala V. Nagala, United States District Judge.

Eric Meyers ("Plaintiff") has brought the present action alleging that PNC Financial Services Group, Inc. ("PNC Financial") violated the Fair Credit Reporting Act (15 U.S.C. § 1681 *et seq.*) ("FCRA") and committed both fraudulent and negligent misrepresentations in its dealings with Plaintiff.[1] Presently before the Court are PNC Financial's motion for summary judgment and Plaintiff's motion for leave to amend the complaint.

Initially, PNC Financial argues that its wholly-owned subsidiary, PNC Bank, N.A. ("PNC Bank"), is the proper defendant in this action, which prompted Plaintiff to file his motion for leave to amend the complaint to add PNC Bank N.A. as a defendant in this action. As described below, the Court GRANTS Plaintiff's motion in part, and will substitute PNC Bank, N.A., for PNC Financial Services Group, Inc., in this action. The Court will refer to PNC Bank as Defendant in this ruling and consider the arguments raised in PNC Financial's motion for summary judgment as having been adopted by Defendant.

---

[1] The Second Amended Complaint ("SAC") also pleads a claim for breach of the covenant of good faith and fair dealing. ECF No. 28 ¶¶ 50–56. This claim was dismissed in the Court's ruling on the motion to dismiss. ECF No. 56.

In its motion for summary judgment, Defendant claims there are no disputed issues of material fact, such that it is entitled to judgment as a matter of law on its claims. Defendant further argues that Plaintiff's state law claims are preempted by the FCRA. Plaintiff counters that, at a minimum, there are disputed issues of material fact and that its state law claims are not preempted, rendering summary judgment inappropriate.

For the reasons described below, Defendant's motion for summary judgment is DENIED in part and GRANTED in part. Specifically, Defendant's motion is denied with respect to Plaintiff's FCRA claims and granted with respect to Plaintiff's state law claims.

I.         FACTUAL BACKGROUND

This hotly contested litigation has been pending for nearly three years, and the parties agree on very few facts. The parties do agree that in February 2003, Plaintiff executed a promissory note and security agreement with National City Bank, Defendant's predecessor bank, to take on a debt of $70,591.81 (the "Note") in order to finance the purchase of a boat. Pl.'s L.R. 56(a)2 St., ECF No. 87-2, ¶ 1. The Note had an annual percentage rate of 5.94% and a finance charge of $36,220.19. *Id.* ¶ 3. In order to secure the Note, Plaintiff granted National City Bank a preferred ship mortgage (the "Mortgage" and together with the Note, the "Loan") encumbering the boat. *Id.* ¶ 2. The Note provided for a 10% late fee, or $40, whichever was greater. *Id.* ¶ 4. After it issued the Loan, National City Bank was acquired by, and became a wholly-owned subsidiary of, PNC Financial. *Id.* ¶ 5. This is where the parties run into their first factual disagreement.

Though PNC Financial was originally named as a defendant in this action, it claims that PNC Bank, its wholly-owned subsidiary, and not PNC Financial, became the owner and servicer of the Loan after this merger. Def.'s L.R. 56(a)1 St., ECF No. 86, ¶ 6. Plaintiff, on the other hand, contends that PNC Financial was jointly the owner and servicer of the Loan. Pl.'s L.R. 56(a)2 St.

¶ 6. In short, the parties disagree over whether PNC Financial jointly owned and serviced the Loan, collected or received payments on the Loan, or reported the status of the Loan to any consumer reporting agencies. *Compare* Pl's L.R. 56(a)2 St. ¶¶ 6–9, *with* Def's L. R. 56(a)1 St. ¶¶ 6–9.

Regardless of which entity owned and serviced the Loan, the parties do agree on at least some of the servicing aspects associated with it. Specifically, the parties agree that Defendant has a computer system that keeps track of the amount of money due on the Loan, the interest calculation, and the payments made toward the balance on the account. Pl.'s L.R. 56(a)2 St. ¶ 10. When Defendant received payments on the Loan, its employees made sure the account was credited for the correct amount. *Id.* ¶ 11. Further, when Defendant receives a monthly payment for a loan, it is standard policy to apply the payment first toward the interest due on the note, with only the remainder being applied to the principal. *Id.* ¶ 13.

At this juncture resides another disagreement between the parties. While Defendant believes the Loan matured on February 1, 2018, Defs.' L.R. 56(a)1 St. ¶ 14, Plaintiff believes the Loan matured on March 1, 2018, Pl.'s L.R. 56(a)2 St. ¶ 14. Regardless, the parties do agree that, correctly or incorrectly, the final monthly loan statement was issued on February 2, 2018, and listed a balance of $1,536.94, including $1,529.97 in principal and $6.97 in interest.[2] *Id.* ¶¶ 15–16. This payment was due February 21, 2018; if payment was not received by that date, further interest would accrue. *Id.* ¶¶ 19–20. The parties do not dispute that, on February 27, 2018, Plaintiff made a payment of $1,536.94, the entire amount listed on the February 2 statement. *Id.* ¶ 21.

Defendant contends that because payment was not made until after February 21, the Loan incurred additional interest charges in an amount of $1.49. Def.'s L.R. 56(a)1 St. ¶ 22. Because

---

[2] The February 2, 2018, statement also included more than $4,000 in late fees. Although there is a dispute over the exact amount of the late fees, this dispute is not germane to the outcome of the present motions.

Plaintiff's February 27 payment only covered the amount listed on the February 2 statement, which did not include the additional interest, the payment was $1.49 short of extinguishing the principal due. *Id.* ¶ 23. Since the Loan had already reached its term by this point, Defendant did not send Plaintiff any further statements regarding amounts due. *Id.* ¶ 26. Despite this, Plaintiff was expected to make payments on the Loan until the principal was reduced to zero; if this was not done within 30 days of such payment being due, Defendant's computer automatically sent a report of delinquent payment to the consumer reporting agencies. *Id.* ¶ 28. These reports were generated not only after 30 days, but also after 60, 90, and 120 days without a payment. *Id.* In the present case, Plaintiff did not make a payment prior to any of the aforementioned times, so reports were generated and sent to the consumer reporting agencies after 30, 60, 90, and 120 days. *Id.* ¶¶ 30–37.

Plaintiff, on the other hand, asserts that there is no mathematical way that $1.49 in interest could have accrued during the time period in question, since interest accrued at $0.25 per day. Pl.'s L.R. 56(a)2 St. ¶ 22. Moreover, Plaintiff claims that his wife called Defendant on February 27, 2018, requesting the amount that would pay the Loan in full, and that she was told $1,536.94 would cover the remaining balance on the Loan. *Id.* Plaintiff subsequently paid this amount on that same day. *Id.* Plaintiff believed the Loan was paid off in full after this payment, given that he believed the last payment was not due until March 1, and that he did not receive a statement on March 1, 2018. *Id.* ¶ 29. Thus, Plaintiff believes that Defendant never should have notified any of the consumer reporting agencies of any delinquent payment, as there was no amount outstanding. *Id.* ¶¶ 30–39.

Regardless of whether Defendant was correct to send the notifications of Plaintiff's alleged delinquency to the consumer reporting agencies, it is undisputed that such notifications were sent.

4

After several months of these notifications, and after seeing a large drop in his credit score, on or around May 7, 2018, Plaintiff telephoned Defendant about any potential outstanding balance on the Loan. *Id.* ¶ 37.[3] After this call, Defendant sent a letter dated May 9, 2018 (the "May 9 Letter"), to Plaintiff advising him that $1.49 in principal and $4,068.33 in late fees remained outstanding on the Loan. *Id.* ¶ 38. According to Defendant, this was the only communication Defendant sent to Plaintiff regarding the balance of the Loan, other than the account statements. Def.'s L.R. 56(a)1 St. ¶ 39. Plaintiff vehemently disagrees, arguing that representations were made by Defendant to Plaintiff's wife and to another person discussed below regarding the outstanding balance on the Loan. Pl.'s L.R. 56(a)2 St. ¶ 39.

In late May of 2018, after receiving the May 9 Letter from Defendant, Plaintiff approached Mathew Chmiel, a loan originator at Inland Home Mortgage ("IHM") to inquire about refinancing his residential mortgage. *Id.* ¶ 46. Plaintiff informed Mr. Chmiel that he was currently being reported by Defendant for late payments. *Id.* It is undisputed that Plaintiff never paid the additional $1.49, but, on June 29, 2018, after Plaintiff first met with Mr. Chmiel, Defendant zeroed out the principal, waived the $4,068.33 in late fees, and closed the account all the same. *Id.* ¶ 43. After closing out the account, Defendant sent Plaintiff a letter confirming the Loan was "paid in full." *Id.* ¶ 45.

Around this same time, either in late June or early July of 2018, Plaintiff requested that Mr. Chmiel reach out to Defendant on Plaintiff's behalf about the disputed balance. *Id.* ¶ 48. In order to grant Mr. Chmiel permission to discuss Plaintiff's account with Defendant, Plaintiff executed a Borrower's Certification & Authorization and a Specific Power of Attorney authorizing Mr. Chmiel to "enter into offers, agreements, or contracts of a like nature for the resolution of" the

---

[3] While the parties agree that this call occurred, they disagree regarding precisely what took place on the call, as the recordings were either not produced or no longer exist.

Loan. *Id.* ¶¶ 49–50. On July 2, 2018, Mr. Chmiel contacted Defendant on Plaintiff's behalf. *Id.* ¶¶ 51–52.

The contents of this conversation are disputed. Defendant claims that Mr. Chmiel did not identify himself as a representative of a consumer reporting agency. Def.'s L.R. 56(a)1 St. ¶ 54. Rather, he informed Defendant that he was calling on behalf of Plaintiff and was simply trying to get clarification on whether there was anything due or open in Plaintiff's name. *Id.* ¶ 55. According to Defendant, this was the only contact Mr. Chmiel had with it, and Mr. Chmiel was acting on behalf of Plaintiff, not IHM, during this interaction. *Id.* ¶¶ 55, 68. Plaintiff, on the other hand, contends that the evidence of Mr. Chmiel's conversation was destroyed by Defendant and thus, at a minimum, there is an issue of material fact over what took place during that call. Pl.'s L.R. 56(a)2 St. ¶¶ 51–55.[4] Plaintiff also argues that Mr. Chmiel faxed Defendant three times and had six phone calls with Defendant, not simply the one alleged by Defendant. *Id.* ¶ 55. Whether Mr. Chmiel's interactions with Defendant constitute notice to Defendant of a credit dispute that was reported by a "consumer reporting agency," as that term is defined in the FCRA, is central to Defendant's motion for summary judgment. Further facts regarding this issue are set forth below.

On July 10, 2018, Defendant issued a Release of Mortgage or Claim of Lien on the Vessel that was encumbered by the Loan. *Id.* ¶ 70. On December 11, 2019, approximately two weeks after the initiation of the present lawsuit, Plaintiff filed three credit disputes with Equifax,

---

[4] Plaintiff further argues that, because Defendant failed to preserve electronically stored information, including information about this call from Mr. Chmiel, the Court should make an inference that the evidence would have been unfavorable to the Defendant. ECF No. 87 at 16–17. In order to seek sanctions on the grounds of spoliation of evidence, the party moving for such sanctions bears the burden of showing through a preponderance of evidence (1) that the party in control of evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a "culpable state of mind"; and (3) that the destroyed evidence was relevant to the moving party's claim or defense. *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002); *Doe v. Wesleyan Univ.*, No. 3:19-CV-01519 (JBA), 2022 WL 2656787, at *12 (D. Conn. July 8, 2022). Plaintiff discusses none of these factors, and the Court will not decide this issue as part of the present motions, as such a decision would have no effect on the outcome of the present motions. If Plaintiff wishes to pursue this issue, he may do so in a separate motion, addressing the factors discussed above.

Experian, and TransUnion regarding the Loan. *Id.* ¶¶ 71–72. Defendant investigated what was reported to these agencies and confirmed that any information provided was accurate. *Id.* ¶ 73. Nevertheless, after conducting this investigation, Defendant voluntarily removed the delinquent notations from Plaintiff's file at each of the three major consumer reporting agencies. *Id.* ¶ 74.

## II. PLAINTIFF'S MOTION FOR LEAVE TO AMEND THE COMPLAINT

Although PNC Financial litigated this case as the sole defendant for nearly three years and stipulated in the parties' Rule 26(f) report that it serviced the Loan, the lead argument in its motion for summary judgment is that the correct defendant should be PNC Bank, rather than PNC Financial. In response to this argument, Plaintiff filed a motion for leave to amend his complaint to "add and/or substitute" PNC Bank as a party. ECF No. 88. Although Plaintiff originally sought to add PNC Bank as an additional defendant, *see* ECF No. 96, Plaintiff stated at oral argument that he was amenable to substituting PNC Bank for PNC Financial if that was the course of action preferred by the Court. PNC Financial has no objection to such a substitution and, indeed, has litigated the motion for summary judgment as if PNC Bank were a named defendant.

The Court finds that substituting PNC Bank for PNC Financial is the appropriate course of action. Federal Rule of Civil Procedure 15(c)(1) allows for amendment of a complaint to change the name of a party where (i) the claim arises out of the same conduct in the original complaint; (ii) the new defendant received notice of the action within 90 days of service of the complaint, such that it will not be prejudiced in defending on the merits; and (iii) the new defendant "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(B) & (C). This rule operates not only to bring in a new party not previously named but also "to correct a misnomer or

misdescription of a defendant." *Datskow v. Teledyne, Inc., Cont'l Prod. Div.*, 899 F.2d 1298, 1305 (2d Cir. 1990).

Here, each of these requirements is met. Following clarification of this issue at oral argument, Plaintiff seeks only to amend the complaint to substitute PNC Financial with PNC Bank. The underlying allegations in the operative complaint will remain unchanged. Thus, the claim arises of the same conduct that was alleged in the original complaint. Second, at oral argument on the present motions, Defendant stated that PNC Bank and PNC Financial are represented by the same counsel and the motion for summary judgment submitted by PNC Financial advanced the same arguments that PNC Bank would have put forth were it a defendant. Thus, it is clear that PNC Bank has been aware of this lawsuit since its inception and will not be prejudiced by now being forced to formally litigate this case on its own behalf. Finally, it is undisputed that Plaintiff is attempting to sue the party that was responsible for holding and servicing his loan. Were it not for a misunderstanding as to which entity in a complicated corporate framework that was, Plaintiff would have sued PNC Bank from the outset.

Therefore, PNC Bank should be substituted as the defendant in this action. The Clerk of Court is directed to add PNC Bank, N.A. as a defendant to this action and dismiss PNC Financial Services, Inc. from this action. Plaintiff shall also file an Amended Complaint naming PNC Bank N.A. as the sole defendant no later than October 12, 2022.

**III.    SUMMARY JUDGMENT LEGAL STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A disputed fact is material only where the determination of the fact might affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is the

8

moving party's burden to show there are no disputed material facts. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden can be met by pointing out an absence of evidence to support the non-moving party's case. *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002). If the moving party demonstrates there are no disputed issues of material fact, the burden shifts to the non-moving party to rebut this showing through introduction of "specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). When examining the record, "the court must resolve all ambiguities and draw all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992). Thus, "only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

## IV.   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A.   Violation of the FCRA

The FCRA was passed in 1970 "amidst concerns about the accuracy of information disseminated by credit reporting agencies." *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 444 (2d Cir. 2015). Its goals were to "ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007). Section 1681s-2(b) of the FCRA requires a furnisher of information, such as Defendant, to investigate the accuracy of the information it provided to a consumer reporting agency, if it receives notice of a purported inaccuracy from a consumer reporting agency. *See* 15 U.S.C. § 1681s-2(b)(1). To adequately prove a claim under this provision of the FCRA, Plaintiff must show "(1) that he or she notified the consumer reporting agency of the disputed information, (2) that the consumer reporting agency notified the defendant furnisher of the dispute, and (3) that

9

the furnisher then failed to investigate and modify the inaccurate information." *Pride Acquisitions, LLC v. Osagie*, No. 3:12-CV-639 JCH, 2014 WL 4843688, at *8 (D. Conn. Sept. 29, 2014). Plaintiff alleges that Defendant is liable for violating Section 1681s-2(b) under two separate penalty provisions of the FCRA, 15 U.S.C. §§ 1681n and 1681o. ECF No. 28, Counts One and Two. Section 1681n imposes liability on anyone who knowingly violates the FCRA, while section 1681o imposes liability on anyone who negligently fails to comply with the FCRA. 15 U.S.C. §§ 1681o, 1681n.

Importantly, the "duty to investigate [under Section 1681s-2(b)] is only triggered after a furnisher is notified of a dispute" by a consumer reporting agency. *Sprague v. Salisbury Bank & Tr. Co.*, No. 3:18-CV-001487 (VLB), 2019 WL 4246601, at *5 (D. Conn. Sept. 5, 2019). Here, Plaintiff argues that there is at least a genuine issue of material fact as to whether IHM is a consumer reporting agency, such that Mr. Chmiel's interactions with Defendant on behalf of Plaintiff constituted notice of a credit dispute to Defendant by a consumer reporting agency, triggering Defendant's duty to investigate. Defendant contends that IHM is not a consumer reporting agency. Therefore, whether IHM qualifies as a consumer reporting agency is the first question the Court must consider.

### 1. There Are Disputed Questions of Material Fact Regarding Whether IHM Is a Consumer Reporting Agency Under the FCRA

Under the FCRA, a consumer reporting agency:

> means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681a(f). The FCRA in turn defines consumer reports as:

>any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for-- (A) credit or insurance to be used primarily for personal, family, or household purposes; (B) employment purposes; or (C) any other purpose authorized under section 1681b of this title.

15 U.S.C. § 1681a(d)(1).[5]  Whether a company is a consumer reporting agency does not depend on that company's own view of itself but, rather, whether it satisfies the definition set forth in the FCRA. *See Adams v. Nat'l Eng'g Serv. Corp.*, 620 F. Supp. 2d 319, 328 (D. Conn. 2009) (holding that a staffing agency that assembled and evaluated consumer reports, such as background checks, and sent them to a third party to determine whether to hire a candidate, was a consumer reporting agency under the FCRA).

Here, it is clear there are questions of material fact preventing the Court from granting summary judgment to Defendant on the issue of whether IHM is a consumer reporting agency. Initially, Defendant relies on the affidavit of Frank Binetti, the president of IHM, to support its position. *See* ECF No. 86-4.  Mr. Binetti avers that IHM does not "for monetary fees, regularly aggregate credit information on individual customers, prepare credit evaluations and report those evaluations to persons or firms who rely on those evaluations in making decisions about extending consumer credit." *Id.* ¶ 18.  More directly, he states "Inland Home Mortgage is not a 'consumer reporting agency,' as defined under 15 U.S.C. § 1681a(f)." *Id.* ¶ 9.  Defendant also argues that, by virtue of the power of attorney Mr. Chmiel was acting upon when he contacted Defendant concerning Plaintiff's alleged delinquencies, Mr. Chmiel was acting on behalf of Plaintiff, and not in the capacity of a consumer reporting agency.

---

[5] Title 15 U.S.C. § 1681a(d)(2) provides several exceptions to this general definition, but they are not relevant here.

On the other hand, Plaintiff relies on the declaration of Mr. Chmiel, which states that, "as a regular part of IHM's business, it aggregates consumer information on individual consumers, prepares credit evaluations and reports on these evaluations to persons or firms who rely thereon in making decisions about extending consumer credit." ECF No. 87-3 at 47 ¶ 5. Plaintiff further points to Mr. Chmiel's deposition testimony, in which Mr. Chmiel stated that, in some cases, credit evaluations are "sent out to a third-party who is evaluating for themselves, as well as working with our underwriting department." ECF No. 87-3 at 163:15–164:7.

Thus, despite that Mr. Binetti and Mr. Chmiel both work at the same company, there is a question of material fact concerning whether IHM engages in activity that would meet the FCRA's definition of a consumer reporting agency. Were the Court to resolve this question now, it would be required to weigh the evidence presented and determine whose assessment of IHM's activities is accurate. This it cannot do. *See Anderson*, 477 U.S. at 249 ("at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial"). Additionally, Defendant's argument that Mr. Chmiel was acting specifically on Plaintiff's behalf when dealing with Defendant, and not as a consumer reporting agency, fails to acknowledge that the statutory definition of a consumer reporting agency concerns whether a person or entity "regularly engages" in the types of activity described in the statute—which Mr. Chmiel says IHM does. 15 U.S.C. § 1681a(f). Drawing all inferences in favor of Plaintiff, as the non-movant, it is clear that a reasonable jury could find either that IHM engages in the types of practices that would render it a consumer reporting agency or that it does not. Thus, Defendant's motion for summary judgment on this ground must be denied.[6]

---

[6] The Court notes that while Defendant submitted several factual paragraphs in its Rule 56(a)1 statement regarding the content of the phone call between Mr. Chmiel and its representative, nowhere in its brief in support of its motion does it contend that, if IHM is in fact a consumer reporting agency, then Mr. Chmiel's call did not adequately inform Defendant of the dispute. Thus, the Court need not and will not examine this issue in this decision.

*2. There Are Disputed Issues of Material Fact Regarding Whether Defendant Provided False Information to the Consumer Reporting Agencies*

Defendant next argues that, even if IHM is considered a consumer reporting agency, Plaintiff's claims under the FCRA fail because Defendant did not inaccurately report any information, so there was no need to correct the information it reported. ECF No. 85-1 at 12–13. The Court discussed the competing positions regarding the Loan's outstanding balance in some detail above, so it will not belabor the point here, but, in short, Defendant contends as follows. The Loan matured on February 1, 2018, such that the final statement sent to Plaintiff was the February statement. Defs.' L.R. 56(a)1 St. ¶¶ 14–15. That statement informed Plaintiff that the balance of principal and interest due was $1,536.94; according to Defendant, Plaintiff was also aware that if that balance was not paid prior to February 21, additional interest would accrue. *Id.* ¶¶ 16, 19, 20. Plaintiff paid $1,536.94 on February 27, resulting in the accrual of $1.49 in additional interest, and making his February 27 payment $1.49 short of fully extinguishing the Loan balance. *Id.* ¶ 22. In Defendant's view, this balance remained for an extended period of time, thus making all of Defendant's reports to the consumer reporting agencies accurate.

Plaintiff disputes this version of events. Initially, Plaintiff points to the line on the February 2, 2018, statement instructing him to "please call for payoff amount." ECF No. 87-3 at 69. Plaintiff contends that his wife, an authorized agent of the account, called Defendant on February 27 to ascertain the exact amount due on that date, in order to settle the Loan in its entirety. Pl.'s L.R. 56(a)2 St. ¶ 22. During this phone call, Plaintiff's wife was informed there was a balance, including principal and interest, of $1,536.94. *Id.*; ECF No. 87-3 at 130:11–23. Plaintiff then made a payment that same day, of that amount, thus satisfying what he believed was the entirety of the principal and interest due on the Loan. Pl.'s L.R. 56(a)2 St. ¶ 22. Plaintiff further contends that later correspondence from Defendant confirmed that the amount required to pay off the

entirety of the Loan as of February 27, 2018, the date of Plaintiff's payment, was $1,536.94—the exact same amount Plaintiff actually paid on that day.  ECF No. 87-3 at 3.  Plaintiff received a letter from Defendant, dated June 29, 2018, informing him that his loan had been paid in full.  *Id.* at 20.  Thus, Plaintiff alleges, even Defendant's own correspondence makes clear that Defendant committed an error when it repeatedly informed the credit reporting agencies that he was delinquent on his payments.

It is difficult for the Court to imagine a situation less well-suited for disposition on summary judgment.  There are hardly any facts that are truly undisputed on this issue, and both sides have presented admissible evidence supporting their position.  It is clear, especially drawing all inferences in favor of the non-movant, that a reasonable jury could find that Plaintiff had paid off the entirety of the Loan balance as of February 27, 2018, and that Defendant should never have reported Plaintiff as delinquent to the consumer reporting agencies.  A reasonable jury could also find for Defendant on this issue.  Thus, Defendant's motion for summary judgment as it relates to the FCRA claims must be denied.

### B. State Law Claims

Having determined there are questions of material fact such that granting summary judgment on Plaintiff's claims under the FCRA is inappropriate, the Court next turns to Plaintiff's state law claims.  Specifically, Plaintiff brings claims for fraudulent and negligent misrepresentation under Connecticut common law.  Defendant argues both these claims are preempted by the FCRA, and that, even if they are not preempted, Defendant is entitled to summary judgment on the merits.  The Court agrees with Defendant that the state law claims are preempted by the FCRA.

While the FCRA contains a large and complicated section related to preemption of state laws, the only subsection relevant to the instant case is 15 U.S.C. § 1681t(b)(1)(F). This subsection states, in relevant part, that "no requirement or prohibition may be imposed under the laws of any State-- (1) with respect to any subject matter regulated under -- (F) section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies." 15 U.S.C. § 1681t(b)(1)(F). The Second Circuit has held that this provision applies not only to state statutory laws, but also to state common law. *See Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 106 (2d Cir. 2009).

While the language of § 1681t(b)(1)(F) is broad, the Second Circuit has been clear that it does not preempt "all claims 'relating to the responsibilities' of furnishers in any way, and regardless of the capacity in which the furnisher is acting." *Galper*, 802 F.3d at 447. Instead, the Second Circuit held that the provision at issue preempts "only those claims that *concern* a furnisher's responsibilities" under the FCRA. *Id.* at 446 (emphasis in original). The Court further clarified that § 1681t(b)(1)(F) "does not preempt state law claims against a defendant who happens to be a furnisher of information to a consumer reporting agency within the meaning of the FCRA if the claims against the defendant do not also concern that defendant's legal responsibilities as a furnisher of information under the FCRA." *Id.* Thus, the question for the Court here is whether Plaintiff's state law claims concern Defendant's responsibility as a furnisher of information under the FCRA. It is clear they do.

Plaintiff's primary contention in his state law causes of action is that Defendant's misrepresentations prevented Plaintiff from resolving the issue of Defendant's provision of allegedly incorrect information to consumer reporting agencies. Specifically, Plaintiff identifies three correspondences as the basis for his fraudulent and negligent misrepresentation claims: (1)

15

a letter dated June 29, 2018, informing Plaintiff that the Loan was "paid in full"; (2) a letter dated July 9, 2018, indicating that Plaintiff had overpaid on the Loan by $1.49; and (3) "a set of correspondence dated July 10, 2018, wherein Defendant enclosed a "lien release" and confirmed the Loan was "paid in full." SAC, ECF No. 28, Count Three, ¶¶ 40–42.[7] Plaintiff goes on to allege that Defendant knew these representations in the letters were not true, as it continued to identify Plaintiff internally as "in default *and share that information with third parties*," namely, the consumer reporting agencies. *Id.* ¶ 44 (emphasis added). Plaintiff further alleges that the statements were made to "induce him to discontinue his petition for relief against [Defendant] and to quell his discontent with PNC's earlier actions to identify the Plaintiff as delinquent and its attempt to continue collection efforts." *Id.* ¶ 46. According to Plaintiff, Defendant's misrepresentations resulted in Plaintiff forgoing "opportunities for further adjudication of this dispute," including by discontinuing his communications with the consumer reporting agencies because he believed he had satisfied his outstanding obligations with Defendant. *Id.* ¶ 48. Plaintiff further clarifies in his memorandum in opposition to the present motion that his "common law claims apply to direct communications between the Plaintiff and the Defendant *as to the handling of his credit dispute.*" ECF No. 87 at 32 (emphasis added). In sum, Plaintiff argues that he was lied to during the process of attempting to correct what he believed to be Defendant's incorrect statements to the consumer reporting agencies. It is thus clear to the Court that Plaintiff's state law claims "concern" Defendant's provision of information to consumer reporting agencies, and, thus, concern Defendant's responsibilities as a furnisher of information to consumer reporting agencies under the FCRA. *Galper*, 802 F.3d at 446.

---

[7] At oral argument, much was made by Plaintiff of an alleged phone call between Defendant and Plaintiff's wife in February 2018. While that communication is mentioned in the complaint, ECF No 28 , ¶¶ 12–13, it is not specifically identified as an actionable fraudulent statement in Plaintiff's fraudulent and negligent misrepresentation causes of action and therefore will not be considered by the Court as a potential fraudulent statement.

16

In opposition, Plaintiff argues that, because the FCRA forecloses the opportunity for a private right of action for consumers to sue furnishers directly, *see Longman v. Wachovia Bank, N.A.*, 702 F.3d 148, 151 (2d Cir. 2012), "it is simply not plausible" that the FCRA would also preempt his state law claims and "deprive customers of a cause of action" to rectify intentional or negligent misrepresentations made by furnishers to consumers.  ECF No. 87 at 33.  Regardless of what Plaintiff believes is plausible, whether a claim is preempted is "fundamentally a question of congressional intent," and "when Congress has made its intent known through explicit statutory language, the courts' task is an easy one." *Eng. v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990).  Here, Congress's intent to preempt claims like those Plaintiff asserts is clear.  The gravamen of Plaintiff's state law claims is that Defendant intentionally and negligently misrepresented facts to him in the course of his attempts to challenge Defendant's reports of delinquent payments to the consumer reporting agencies.  These claims plainly concern not only Defendant's general responsibilities as a furnisher of information under the FCRA, but also Defendant's specific acts of reporting the alleged delinquencies to the consumer reporting agencies, and thus are squarely preempted.  *See Sprague*, 2019 WL 4246601, at *10 (finding state law claims preempted where they arose from the same conduct that gave rise to the FCRA claims).  Plaintiff's state law claims must be DISMISSED as a matter of law.

## V.   CONCLUSION

For the reasons stated herein, Defendant's motion for summary judgment is DENIED in part and GRANTED in part.  There are questions of material fact regarding Plaintiff's claims under the FCRA, and Defendant's motion is DENIED as to these claims (Counts One and Two of the SAC).  Plaintiff's state law claims are preempted by the FCRA, and, thus, Defendant's motion as to these claims (Counts Three and Four of the SAC) is GRANTED.

In light of this ruling, the Court will hold a telephonic status conference with the parties to discuss the scheduling of pretrial submissions and jury selection.

**SO ORDERED** at Hartford, Connecticut, this 28th day of September, 2022.

                                        _/s/ Sarala V. Nagala_
                                        SARALA V. NAGALA
                                        UNITED STATES DISTRICT JUDGE